VICTOR AND MARGARET BAIGENT, ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Baigent v. Commissioner
Docket Nos. 14646-81, 11752-82, 11756-82, 11758-82, 29583-82, 4191-83, 18208-83, 28679-83, 13148-84, 29677-84.
United States Tax Court
T.C. Memo 1987-314; 1987 Tax Ct. Memo LEXIS 314; 53 T.C.M. (CCH) 1221; T.C.M. (RIA) 87314; June 24, 1987. Edward B. Simpson, for the petitioners. Barbara M. Leonard, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Each of these consolidated cases involves deductions, *315 losses and investment tax credits claimed by petitioners with respect to their purchases of videotapes from Pro Video Productions, Inc. (Pro Video), either directly or as a partner in Diversified Investors I (Diversfied), and respondent's disallowance thereof. After concessions, the issues for decision are: (1) whether petitioners are entitled to the deductions, losses and credits claimed in connection with their purchases of the Pro Video tapes; (2) whether petitioners are entitled to deduct interest paid on notes used in the purchases of their interests in the videotapes; and, (3) whether petitioners are subject to additions to tax for negligence pursuant to section 6653(a), and with respect to petitioners Moberg only, whether additional amounts are to be added to tax pursuant to sections 6653(a)(2) and 6659. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation *316 of facts and attached exhibits are incorporated herein by this reference. At all relevant times, William G. Ball (Ball) was a certified financial planner; he acted in this capacity with respect to all petitioners in this case. During the latter part of 1976, Ball began to investigate investment opportunities in videotape programs; in 1977 he recommended to his clients (including petitioners) investments in videotapes produced by Del Vida International, Inc. (Del Vida). The videotapes produced by Del Vida generated little or no income. In early 1978, Ball became acquainted with Richard Johnson (Johnson) who at the time was operating a business which sold videotape recorders and closed circuit television equipment. Subsequently, Ball and Johnson discussed the possibility of Johnson's producing commercial videotapes [3] which would then be marketed by Ball. It was agreed that Pro Video, another business then owned by Johnson as a sole proprietor, would produce master videotapes and M&B Enterprises (M&B), a partnership comprised of Ball and Charles Mitchell, would market them. Profits from the sale of such tapes, after deduction of all direct costs of Pro Video and M&B, were to *317 be split 51 percent to Pro Video and 49 percent to M&B. At some point in 1978, Pro Video began the production of master videotapes, each thirty minutes in length. From 1978 through 1980, it produced three series of tapes: Tee Off, Tennis Talk, and New Faces. The Tee Off series, pertaining to instructional golf techniques, was comprised of thirteen tapes, all completed in 1978. [4] The Tennis Talk series was comprised of twelve tapes -- three were completed in 1978, six (including "Singles Tactics", the only tape in this series involved herein) in 1979, and the remaining three in 1980. The New Faces series, pertaining to make-up and wardrobe, was comprised of sixteen tapes -- fourteen were completed in 1979 and the remaining two in 1980. [5]
*318 Ball prepared (on behalf of M&B) an offering brochure for use in marketing the Pro Video videotapes to his clients and other interested individuals. The brochure provided the potential investor with financial and tax projections, as well as a legal opinion as to the tax consequences of the investment. The purchase price for each tape in the Tee Off and Tennis Talk series was $100,000, consisting of an $8,000 cash down payment and a $92,000 purported recourse note. For the New Faces series, the purchase price for each tape was $75,000, consisting of a $6,000 cash down payment and a $69,000 purported recourse note. The notes were all for seven year terms, with interest at the rate of seven percent per annum. A minimum $2,000 annual payment on each note (to be applied to the then accrued but unpaid interest) was required; all additional payments on the notes were to be made solely from the net proceeds of the distribution or other exploitation of the videotapes. [6] The note could be extended for an additional term of seven years with a purported conversion from recourse to nonrecourse at the end of the initial seven year term upon the occurrence of certain conditions and the payment *319 of a $1,000 conversion fee.[7]
*320 Each investor was required to enter into a Production Service Agreement (Production Agreement) with Pro Video. The Production Agreement obligated the producer, Pro Video, to create, develop and produce master videotapes for the investor/owner. In addition to general terms with regard to delivery, warranties, default, etc., the Production Agreement specifically provided that, with the assistance of a management consulting firm, the investor/owner was to enter into a distribution agreement for the commercial exploitation and distribution of the videotape. [8]
*321 The offering brochure contained tax and cash flow projections, reproduced herein in Appendix C. [9] These projections indicate that, absent tax benefits, there would be a net loss and a negative cash flow for the projected years. No income projections were provided, except for the suggestion that income could be derived by investing the tax savings in unrelated activities (i.e., in a real estate limited partnership). Petitioners purchased interests in the videotapes produced by Pro Video as follows: 1978
Percentage
Purchaser
Date
Series
Tape
Ownership
Victor and
Beginning
Margaret Baigent
05-26-78
Tee Off
Golf Swing
50%
Dale and Vernita
Beginning
Kennen
05-26-78
Tee Off
Golf Swing
50%
Albert and Natalie
Beginning
Davis
08-08-78
Tee Off
Putting
100%
Alvin and Phyllis
11-22-78
Tee Off
Advanced Golf
100%
Janklow
Swing
*322 1979
Percentage
Purchaser
Date
Series
Tape
Ownership
Albert and
Singles
Natalie Davis
07-23-79
Tennis Talk
Tactics
50%
Erik and Phyllis
Singles
Moberg
07-23-79
Tennis Talk
Tactics
50%
Marvin and Anita
Tools of
Waldman
12-21-79
New Faces
the Trade
100%
Marvin and Anita
Questions
Waldman
12-21-79
New Faces
and Answers
100%
Erik and Phyllis
Face on
Moberg
11-28-79
New Faces
the Go
100%
Diversified [10]
11-21-79
Fabulous
New Faces
40's
100%
Three Faces
New Faces
of Beauty
100%
Hair and
New Faces
Make-up
100%
*323 Pro Video sold a total of thirty-three tapes to investors (including those sold to petitioners and Diversified) in the years 1978-1980. Petitioners and Diversified executed notes payable to Pro Video on the following dates, in the amounts indicated: Petitioner or
Entity
Date
Amount
Baigent and Kennen
05-26-78
$ 92,000.00
Davis
08-08-78 92,000.00
Davis and Moberg
07-23-79 92,000.00
Waldman
12-21-79 69,000.00
Waldman
undated 69,000.00
Moberg
11-28-79 69,000.00
Janklow
11-22-78 92,000.00
Diversified
various 207,000.00
Petitioners were not required to insure (nor did they insure) their interests in the tapes. In the event of destruction of the tapes, the unpaid balance of the indebtedness encumbering their investment would be forgiven by Pro Video. [11]
Petitioners and Diversified engaged International Communications Consultants (ICC) to distribute the tapes. ICC was owned by *324 John Bowman (Bowman); he was its only employee and was inexperienced in the distribution of videotapes. None of the petitioners inquired as to ICC's past performance with regard to the distribution of videotapes prior to its engagement. Although the manner of each petitioner's (and Diversified's) investment in the tapes was similar, to determine petitioner's profit motive or lack thereof, we set forth the following background information with respect to those petitioners who testified: [12]
Baigent
Petitioner Baigent was an engineer engaged in the building of bulk storage facilities. He had little or no experience in the production or distribution of videotapes. He had, however, purchased through Ball, his financial advisor, a tennis lesson videotape produced by Del Vida. The terms of that investment were substantially identical to those upon which he was to enter with Pro Video. The Del Vida tape, managed and distributed by ICC, had earned little or no income for Baigent. In 1978, Baigent, on the recommendation of Ball, purchased a one-half interest in the Pro Video tape, "The *325 Beginning Golf Swing," in conjunction with another petitioner, Kennen. Baigent did not know whether Ball had prior experience in the production or distribution of videotapes (other than his promotion of the Del Vida tapes), but even so, he relied on Ball to advise him with respect to the venture. At the time of his purchase of the tape, Baigent had neither viewed nor commissioned an appraisal of the tape he was purchasing. Baigent did not question the purchase price set nor did he inquire of the costs of production of such tape. He did not attempt to negotiate a lower price for the tape or change the terms of any agreement or note connected with his purchase. Prior to execution of the Management Agreement with ICC, Baigent did not inquire as to the profitability of ICC's distribution of tapes in prior years. Baigent did now know the identity, profit history or potential of any distributor to be used by ICC in the distribution of the tapes. Kennen
Petitioner Kennen, like Baigent, purchased his one-half interest in the Pro Video tape "The Beginning Golf Swing" through Ball, from whom he had previously purchased a tape produced by Del Vida. The terms of the Pro Video *326 purchase were substantially identical to those involved in the Del Vida purchase. The Del Vida tape, distributed by ICC, had earned little or no income for Kennen. Prior to his purchase of the Pro Video tape, Kennen did not view the tape. Nor did he have the tape appraised prior to purchase or at any time thereafter. Like his co-owner Baigent, Kennen relied on Ball to advise him with regard to the venture, even though he knew that Ball was basically inexperienced in commercial videotapes. Kennen did not know whether Johnson had any experience in the production of video tapes. Like Baigent, Kennen did not attempt to negotiate or change any of the terms of the agreements or notes pertaining to the acquisition of his interest in the tape. Kennen did not request any financial data from ICC with regard to its distribution of videotapes prior to his execution of the Management Agreement. In 1979, Kennen became a partner in Diversified, aware that Diversified was intending to purchase three Pro Video tapes, with ICC as the probable distribution agent. Davis
Petitioner Davis was a systems engineer for IBM, with experience in the area of customer service and data processing *327 equipment installation. Davis relied upon Ball for advice with respect to the purchase and management of the Pro Video tape, even though he was aware that Ball had little or no experience in commercial videotape production or distribution. At the time of his acquisition of the tape "Beginning Putting" in 1978, Davis had not viewed the tape, but he had viewed tapes in the Tee Off series. He also had not obtained an appraisal of the tape he was purchasing. He did not know whether Johnson had previously produced any commercial video tapes. When he engaged ICC to manage and distribute his videotape, Davis was unaware of ICC's past financial or distributional history. In 1979, Davis purchased a one-half interest in the videotape "Singles Tactics." In addition, he became a partner in Diversified. Davis purchased his interest in the "Singles Tactics" tape under the same conditions as he purchased the "Beginning Putting" tape, i.e., he did not view the tape or have it appraised, he did not attempt to negotiate any of the terms of the agreements or notes on the purchase, and he engaged ICC as the distributor of the tape without any knowledge of its distribution achievements. *328 Moberg
Petitioner Moberg was an airline pilot at the time of his purchase of Pro Video products. In 1979, Moberg purchased a one-half interest in "Singles Tactics", a tape co-owned by petitioner Davis. He also at that time purchased the tape "Face on the Go." Both tapes were acquired by Moberg through Ball. Moberg did not view either tape prior to its purchase nor did he obtain an appraisal of either tape's commercial value. Moberg was aware at the time of his purchases that Ball had little or no experience in the commercial production and distribution of such tapes. He did not know whether Johnson had any experience with videotapes. As with the other petitioners, Moberg did not attempt to alter or negotiate any of the terms of the agreements or notes. He did not inquire as to ICC's financial status or its distribution achievements. Moberg did not know if other Pro Video tape owners had contracted with ICC to distribute their tapes. Waldman
Petitioner Waldman was, at the time of his Pro Video purchase, an engineer with 20 years of experience as an electronics representative for manufacturers. He had no experience with the production, distribution or marketing *329 of commercial videotapes, relying solely upon Ball for advice with regard to the acquisition and management of the tapes. He did not know whether Ball had any experience in the videotape field or whether Ball had arranged the sale of other videotapes in the past. Waldman acquired two tapes from Pro Video in 1979: "Tools of the Trade" and "Questions and Answers." Prior to his acquisition of the tapes, Waldman did not view the tapes, seek an independent appraisal of their commercial worth, or inquire as to the costs of production of such tapes. He did not negotiate any of the terms of the agreements or notes associated with his purchases, including the price of the tapes. Waldman also was a partner in Diversified. Waldman had no prior knowledge of ICC's past history regarding the distribution of videotapes. Diversified
Diversified, the general partnership formed by Ball in 1979, purchased in that same year three tapes in the New Faces series: "Fabulous 40's", "Three Faces of Beauty", and "Hair and Make-up." Ball was aware that Johnson had little or no prior experience in the production of commercial videotapes or in the distribution of such tapes. He was also aware that *330 a tennis lesson series produced by Del Vida and distributed by ICC had earned little or no income. Despite this knowledge, Ball contracted with ICC to manage the distribution of Diversified's Pro Video's videotapes. Ball did not seek an independent appraisal of the tapes he purchased on behalf of Diversified. During 1978, 1980 and 1981 (the years in issue), no net income was earned on the Pro Video tapes. The only showing of the tapes during these years occurred at two local origination cable stations in Sepulpa, Oklahoma in December of 1979. Appendix D lists the tapes aired at such time. The total gross revenue from these showings was approximately $50 per show or $1,350 in the aggregate. Petitioners received no income after expenses and costs of distribution. Outside of this airing, none of the tapes aired on any public or commercial television station, in any public schools, or in any other medium or avenue of exposure during the years in issue. None of the tapes was sold in the alternative home video market. In or about August of 1981, ICC informed petitioners and Diversified by letter that it intended to terminate the Management Service Agreement in effect with respect *331 to petitioners' and Diversified's videotapes. The letter cited the failure of ICC's distributor, Video Marketing Associates, to perform the services required to market petitioners' programs. ICC stated that it was unable to achieve the desired marketing results and suggested that petitioners contact the producer (Pro Video) to obtain assistance in finding another distributor. In early January of 1982, each petitioner entered into a Management and Service Agreement with Progress Research Organization, Inc. (Progress) for purposes of distributing the videotapes. Progress was owned and operated by Johnson; Johnson had no experience in the actual marketing and distribution of commercial videotapes other than his Pro Video production efforts. No income was earned by Progress or by Pro Video from the distribution of the tapes. Petitioners claimed deductions, losses and tax credits with respect to their acquisition of the videotapes from Pro Video (see Appendix B). In addition, petitioners claimed interest deductions with respect to the payments made on their notes to Pro Video. Respondent disallowed these deductions and tax credits, claiming primarily [13] that the videotapes were *332 not purchased with an intent to make a profit and that the notes did not constitute genuine indebtedness. In addition, respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a) and, with respect to petitioners Moberg only, additions to tax under section 6653(a)(2) and section 6659. OPINION In order to be entitled to the claimed deductions, losses and investment tax credits, petitioners must show that the videotapes were acquired with an intent to earn a profit; they bear the burden of proof in this regard. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). To establish that an activity is one engaged in for profit, petitioners must show that they engaged in the activity with an actual and honest objective of making a profit. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion (D.C. Cir. 1983). *333 Their expectations need not be reasonable ones, but the profit objectives must be bona fide. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra.In determining whether the requisite intention to make a profit exists, greater weight is to be given to the objective facts than to one's self-serving characterization of his intent. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. Where a partnership is involved, the issue of whether an activity is one engaged in for profit is determined at the partnership level. In making such a determination, the focus is on the intent of the general partner(s) and the promoter(s) since they are the individuals who actually control the partnership's activities. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); see Flowers v. Commissioner,80 T.C. 914, 931 (1983). Section 1.183-2(b), Income Tax Regs., lists the following nine relevant, non-exclusive factors to be used in determining whether an activity is one engaged *334 in for profit: (1) The manner in which the taxpayer carries on the activity; (2) The expertise of the taxpayer or his advisors; (3) The time and effort expended by the taxpayer in carrying on the activity; (4) The expectation that assets used in activity may appreciate in value; (5) The success of the taxpayer in carrying on other similar or dissimilar activities; (6) The taxpayer's history of income or losses with respect to the activity; (7) The amount of occasional profits, if any, which are earned; (8) The financial status of the taxpayer; and (9) Elements of personal pleasure or recreation in the activity. No one factor is controlling; rather it is an evaluation of all the facts and circumstances of the case, taken as a whole, which is determinative. Section 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). We proceed with our analysis without a prolonged discussion of each of the factors set forth in the regulations, but we have taken all such factors into account *335 in understanding the totality of the circumstances revealed by the record herein in the context of the positions asserted by the parties. See Estate of Baron v. Commissioner,83 T.C. 542, 544 (1984), affd. 798 F.2d 65 (2d Cir. 1986). [14] We are mindful that where, as here, a taxpayer is generally passive with regard to the activities associated with his investment (i.e., he delegates his duties to third parties), then the care he exercises in his investment acquisition, the assignment of such duties to third parties, and the oversight exercised in the performance of the duties are of heightened importance in the determination of profit motivation. Flowers v. Commissioner,supra.[15]
*336 The record in this case establishes that neither petitioners nor Diversified acquired the videotapes with a profit objective. An analysis of the Pro Video program and financing structure illustrates why we arrive at this conclusion. During the year 1978, Baigent and Kennen (as co-owners), Davis, and Janklow purchased tapes in the Tee Off series. In 1979, Davis and Moberg (as co-owners), Waldman, Moberg, and the partners in Diversified (Davis, Waldman, Kennen, Janklow and Bucknum) purchased tapes in the Tennis Talk and New Faces series. Purchasers of the Tee Off and Tennis Talk series tapes purported to pay $100,000 for each tape, an $8,000 down payment with a note in the amount of $92,000. Financing for the tapes in the New Faces series was similar as for the other two series; however, the purchase price was $75,000 with $6,000 in down payment and $69,000 in the form of a note. Although the notes were characterized as recourse, except to the extent of $15,000, payment thereon was to be made solely from the distribution and exploitation proceeds of the tapes. The $15,000 is derived by multiplying $2,000 (the amount of the required annual payment) by 7 (the number of years comprising *337 the recourse term of the note) and by adding to the product ($14,000) the $1,000 conversion fee. Thus, except to the extent of $15,000, the notes were, in essence, contingent, nonrecourse obligations. Petitioners and Diversified were provided with copies of the offering brochure prior to acquiring the videotapes. The brochure presented projections to the investors which focused solely upon the tax benefits to be derived from the investment. The tables contained in the brochure indicate that the only projected source of income was from an investment of the tax savings in unrelated activites (i.e., a real estate limited partnership). Such investments were not part of the videotape purchase but were envisioned as a vehicle for utilization of the tax benefits derived from ownership of the tape. The brochure, in describing the projections, stated that "No provision has been made for income produced from a videotape master * * *." It is thus readily apparent that the transaction, from its inception, was primarily (if not solely) tax-oriented and that the profit to be obtained from owning the videotapes was to come from anticipated tax savings. It is also enlightening to examine the *338 actual purchases of the videotapes by petitioners and Diversified. Ball, as the financial advisor to petitioners, approached each of them and advised them to purchase the videotapes for investment purposes. Ball had little or no experience in the production or distribution of videotapes, nor did any of the petitioners. [16] Petitioners did not question Ball's lack of experience, nor did they inquire as to the experience of Pro Video or its owner, Johnson, in this field. Petitioners did not attempt to negotiate the purchase price or alter the terms of any agreements or notes connected with the investment, nor did they obtain independent appraisals of the tapes prior to their investments in them. In fact, petitioners did not even view the actual tapes purchased prior to acquisition. [17] Simply stated, petitioners made no independent investigation with regard to their purchase *339 of the videotapes. The engagement of ICC as the distribution manager for the tapes parallels petitioner's investigation with regard to the purchase of the videotapes. No inquiries were made as to the financial history, the managerial or distributional experience of ICC, or the reputation and business acumen of its president, Bowman. Those petitioners who had previously invested in the Del Vida tapes (which were also distributed by ICC) were aware of ICC's poor performance. Notwithstanding such poor performance, they still engaged ICC to distribute their Pro Video tapes and ICC's performance with respect to the Pro Video tapes was the same as that experienced with respect to the Del Vida tapes. [18]
As the aforesaid indicates, petitioners exhibited a complete disregard of the practical economic and business concerns inherent in their purchase and exploitation of the Pro Video tapes, especially in view *340 of the lack of expertise displayed by all parties involved, as well as the acceptance, solely on its face, of the Pro Video investment. [19] See Section 1.183-2(b)(1), Income Tax Regs.; Surloff v. Commissioner,81 T.C. 210 (1983); Fox v. Commissioner,80 T.C. 972 (1983), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984). With respect to Diversified, we find the same lack of a bona fide profit motive. Four of the five petitioner-partners of Diversified purchased tapes individually. With respect to those petitioner-partners, we have found that they individually did not acquire their tapes with a profit motive. There is nothing in the record to indicate that the other petitioner-partner (i.e., Bucknum) *341 had the requisite profit objective. Our conclusion that there was no profit motive is further bolstered by our own viewing of the tapes in question. In our opinion, the quality of the tapes is poor. The instructors featured in the tapes are unknown personalities and have limited appeal in the marketplace. Several expert witnesses testified as to the fair market value of the video tapes in question. Each expert presented his estimation of the quality, income potential and fair market value of the tapes. Upon consideration, we find respondent's expert, A. Frank Reel, to have provided the most credible estimation of such value. [20] Mr. Reel cited inherent problems with the video tapes as to production quality, content and presentation and the severe limitations (both contractual and physical) presented in the distribution of this tape series in the consumer marketplace. In light of such limitations, Mr. Reel anticipated potential gross receipts of $2,000 to $3,000 in the Tee Off and Tennis Talk series and $4,000 to $6,000 in the New Faces series, resulting in a post-distribution value for each tape in the Tee Off and Tennis Talk series of $1,000 to $1,500, and $2,000 to $3,000 *342 in the New Faces series. [21] After reviewing the testimony of all the experts, and the record as a whole, we conclude that the tapes in the Tee Off and Tennis Talk series had fair market values on their dates of acquisition of $1,500 per tape and the tapes in the New Faces series had fair market values on their dates of acquisition of $3,000. Thus, the purported price paid for the tapes greatly exceeded their true values. Based on the aforesaid analysis, we are satisfied that petitioners did not acquire the videotapes with an actual and honest objective of making a profit. Further, we are satisfied that the purchase of the videotapes lacked economic substance; accordingly, we sustain respondent's determination and hold that petitioners are not entitled to the deductions, losses or investment tax credits claimed with respect to their purchases of the videotapes. *343 Our finding that petitioners (and Diversified) did not acquire the videotapes with the requisite profit motive does not per se preclude petitioners from being entitled to deduct interest paid on the notes given to Pro Video, to the extent that such notes constitute genuine indebtedness. See Rose v. Commissioner,88 T.C. 386 (1987); Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). As stated previously, the notes used to purchase the tapes were, in essence, contingent nonrecourse obligations, except to the extent of $15,000. In our opinion, $15,000 of each note constitutes a genuine recourse obligation due Pro Video, representing not only the principal amount of the obligation due Pro Video but also the entire cumulative interest thereon, at the rate of seven per cent per annum for seven years. See Waddell v. Commissioner,86 T.C. 848, 910 (1986); Porreca v. Commissioner,86 T.C. 82 (1986). The $15,000 was essentially fixed and unconditional; it had to be paid in order to extend the maturity date and convert the maker's obligation under the *344 note from recourse to nonrecourse. [22] The required payments were actually made. We leave to the parties in their Rule 155 computation the calculation of the precise discounted principal amount of the obligation and the annual interest thereon (calculated at the rate of seven percent per annum). We now turn to the various additions to tax. Respondent determined additions to tax pursuant to section 6653 and section 6659, as follows: Petitioner
Additions to Tax
Taxable Year(s)
(a) Baigent
Section 6653(a)
1978 and 1975
(b) Davis
Section 6653(a)
1978, 1979 and 1980
(c) Kennen
Section 6653(a)
1978 and 1975
(d) Waldman
Section 6653(a)
1979, 1980 and 1977
(e) Janklow
Section 6653(a)
1978
(f) Moberg
Section 6653(a)
1979, 1976, 1977, 1980
Section 6653(a)(1)
1981
Section 6653(a)(2)
1981
Section 6659
1981
Section 6653(a) provides for an addition to tax of five percent of the underpayment *345 of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations.[23] For purposes of section 6653(a), negligence has been defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Petitioners again bear the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). *346 In purchasing the videotapes, petitioners paid little attention to the investment they were undertaking. They did not seek advice from anyone other than Ball as to the propriety and financial merit of the investment. In addition, petitioners did not view their tapes prior to purchase, nor did they seek independent appraisals of the worth of said tapes. Petitioners' actions did not remotely approach the actions which reasonable and ordinarily prudent persons would have taken, especially in light of petitioners' lack of experience in this field and the amount of their purported investments. As such, we find that petitioners have failed to carry their burden of proof; hence, we sustain respondent's determinations of the additions to tax under section 6653(a). With respect to petitioners Moberg, for 1981, respondent determined they are liable for both the addition to tax under section 6653(a)(1) and the additional amount to be added to the tax as provided by section 6653(a)(2). [24] We sustain that determination. Further with respect to petitioners Moberg for 1981, respondent determined an addition to tax under section 6659. Section 6659[25] *347 provides for an addition to tax of up to 30 percent of the portion of the underpayment of tax that is attributable to an overstatement on the tax returns of the value of property or of its adjusted basis, by an amount that is 150 percent or more of its true value or true adjusted basis. *348 The cost or other basis of the videotape reported by the Mobergs on their 1981 return was $50,000 (for Singles Tactics) and $75,000 (for Face on the Go). We have determined the true fair market value of the tapes to be $1,500 for tapes in the Tennis Talk series (Singles Tactics) and $3,000 for tapes in the New Faces series (Face on the Go) and that the purchase price or cost of the tapes was grossly inflated. In valuing their interests in the tapes, there was an overvaluation of the tapes within the meaning of section 6659(c) in excess of 250 percent. [26] As the underpayment of tax for 1981 was attributable in part to a valuation overstatement, and the underpayment attributable to the valuation overstatement is in excess of $1,000, the applicable percentage under section 6659(b) of 30 percent is applicable to that portion of the underpayment attributable to the overstatement upon the final determination of other issues with respect to the Mobergs' 1981 taxable year. [27]
*349 This opinion involves only the Pro Video issue in these consolidated cases; accordingly, As to those petitioners whose cases involve solely the Pro Video issue, decisions will be entered under Rule 155.
As to those petitioners whose cases involve one or more unrelated issues which have been settled, decisions will also be entered under Rule 155.
As to those petitioners whose cases involve one or more as yet unresolved and unrelated issues, an appropriate order will be entered.
APPENDIX A RESIDENCE AT
TIME PETITION
TAXPAYER
DOCKET NO.
YEAR
DEFICIENCIES
ADDITIONS
WAS FILED
Victor & Margaret
Baigent
14646-81
1978
$7,270.89
6653(a)
Walnut Creek,
$364.00
CA
1975
3,139.00
6653(a)
157.00
1977
6,325.00
6653(a)
316.00
Victor & Margaret
Baigent
29583-82
1979
6,203.00
Walnut Creek,
CA
1980
4,939.00
Albert & Natalie
Davis
11758-82
1978
15,333.00
6653(a)
Lafayette, CA
767.00
Albert G. & Natalie S.
Davis
18208-83
1979
14,714.00
6653(a)
Lafayette, CA
736.00
1980
11,330.00
6653(a)
567.00
Dale & Vernita
Kennen
11752-82
1978
6,048.00
6653(a)
Pleasant Hill,
302.00
CA
1975
3,437.00
6653(a)
172.00
Dale A. & Vernita
Kennen
13148-84
1979
5,930.00
Pleasant Hill,
CA
1980
6,136.00
Marvin D. & Anita
Waldman
18208-83
1979
47,220.00
6653(a)
Menlo Park, CA
2,361.00
Marvin D. & Anita
Waldman
13148-84
1980
22,078.00
6653(a)
Menlo Park, CA
1,104.00
1977
3,537.00
6653(a)
177.00
Jack E. & Helen L.
Bucknum
29677-84
1979
2,074.00
San Anselmo, CA
1980
2,959.00
Erik & Phyllis
Moberg
4191-83
1979
482.00
6653(a)
Concord, CA
24.10
1980
221.22
6653(a)
11.06
1976
5,836.20
6653(a)
291.81
1977
5,104.00
6653(a)
255.20
1978
375.00
6653(a)
18.75
Erik & Phyllis
Moberg
28679-83
1981
3,650.91
6653(a)(1)
Concord, CA
182.55
6653(a)(2)
6659
613.50
Alvin & Phyllis
Janklow
11756-82
1978
13,532.00
6653(a)
Los Altos
677.00
Hills, CA
*350 APPENDIX B
Deductions and/or
Credits (Amount)
Petitioner
Tape
Year
Loss
Depreciation
Interest
Victor and
The Beginning
1978
$6,875.00
$1,000.00
Margaret
Golf Swing
1975
Baigent
(1/2 interest)
1979
5,750.04
1,000.00
1980
5,825.00
1,000.00
Albert and
Beginning Putting
1978
9,002.00
2,000.00
Natalie
1979
12,000.00
2,000.00
Davis
1980
12,000.00
2,000.00
Singles Tactics
1979
6,781.26
1.000.00
(1/2 interest)
1980
5,827.00
1,000.00
Diversified Investors
1979
$4,011.80
100.00
1980
2,108.00
Dale and
The Beginning
1978
6,875.02
1,000.00
Vernita
Golf Swing
1975
Kennen
(1/2 interest)
1979
5,750.04
1,000.00
1980
5,749.92
1,000.00
Diversified Investors
1979
4,011.80
100.00
1980
2,108.00
Marvin and
Tools of the Trade &
1979
9,375.00
Anita
Questions and
1980
18,750.00
3,000.00
Waldman
Answers
Diversified Investors
1979
5,617.00
140.00
1980
2,951.00
1977
Jack E. and
Diversified Investors
1979
6,418.88
160.00
Helen
1980
3,373.00
Bucknum
Erik and
Singles Tactics
1979
12,416.66
2,500.00
Phyllis
(1/2 interest);
Moberg
Face on the Go
1976
1977
1978
1980
15,125.00
1981
15,125.00
5,000.00
Alvin and
Advanced Golf Swing
1978
1,042.00
2,000.00
Phyllis
Janklow
Diversified
Three Faces of Beauty;
1979
6,645.82
4,500.00
Investors
Hair and Make-Up;
1980
28,125.00
4,500.00
Fabulous 40's
*351 Deductions and/or
Credits (Amount)
Petitioner
Tape
Year
ITC
Other
Victor and
The Beginning
1978
* $5,000.00
Margaret
Golf Swing
1975 ** 3,139.00
Baigent
(1/2 interest)
1979
1980
Albert and
Beginning Putting
1978
10,000.00
$50.00
Natalie
1979
Davis
1980
Singles Tactics
1979
* 5,000.00
75.00
(1/2 interest)
1980 ** 2,483.00
Diversified Investors
1979
202.00
1980
1,183.60
Dale and
The Beginning
1978
5,000.00
25.00
Vernita
Golf Swing
1975 ** 3,436.75
Kennen
(1/2 interest)
1979
1980
Diversified Investors
1979
* 1,327.00
1980 ** 1,312.45
Marvin and
Tools of the Trade &
1979
15,000.00
150.00
Anita
Questions and
1980
150.00
Waldman
Answers
Diversified Investors
1979
283.00
1980
* 1,657.10
1977 ** 1,657.10
Jack E. and
Diversified Investors
1979
323.30
Helen
1980
1,893.80
Bucknum
Erik and
Singles Tactics
1979
* 12,500.00
225.86
Phyllis
(1/2 interest);
Moberg
Face on the Go
1976 ** 5,836.20
1977 ** 5,104.00
1978 ** 375.00
1980
.25
1981
307.47
Alvin and
Advanced Golf Swing
1978
10,000.00
25.00
Phyllis
Janklow
Diversified
Three Faces of Beauty;
1979
11,250.00
Investors
Hair and Make-Up;
1980
11,200.00
Fabulous 40's
*352 APPENDIX C
The following table presents tax projections utilized in the brochure promoting the Pro Video investment. For illustrative purposes, our table here covers only the initial seven years of the investment, beginning with a videotape purchase hypothetically made in June of 1978. Immediately following the table are footnotes applicable to the relevant items in the table. Purchase in June
1978
1979
1980
1. Purchase Price
$100,000 2. Down Payment
8,000 3. Expenses & Interest
2,000 2,000 2,000 4. Total Annual Cash Expenditure
$ 10,000 $ 2,000 $ 2,000 5. Annual
Depreciation n(1) n(2) n(3)
$ 8,125 $12,250 $12,250 6. Remaining Depreciated Value
91,875 79,625 67,375 7. Taxable Income (Loss)
($ 10,125)
($14,250)
($14,250)
8. Taxes Saved (Paid) [n(4)]
15,569 7,838 7,838 9. Net Available Cash [n(5)]
5,569 6,757 7,231 10. Investment Results of Avail.
Cash [n(6)]
11. Additional Deduction [n(7)]
$ 1,671 $ 2,027 $ 2,169 12. Taxes Saved (Paid) [n(8)]
919 1,115 1,193 13. Cash Flow
278 616 14. Additional Cash Available [n(9)]
919 1,393 1,809 15. Cum. R.E. Ltd. Ptnrshp. at 5%
$ 5,569 $12,604 $20,466 *353 Purchase in June
1981
1982
1983
1984
1. Purchase Price
2. Down Payment
3. Expenses & Interest
2,000 2,000 2,000 2,000 4. Total Annual Cash Expenditure
$ 2,000 $ 2,000 $ 2,000 $ 2,000 5. Annual
Depreciation [n(1)] [n(2)] [n(3)]
$12,250 $12,250 $12,250 $12,250 6. Remaining Depreciated Value
55,125 42,875 30,625 18,375 7. Taxable Income (Loss)
($14,250)
($14,250)
($14,250)
($14,250)
8. Taxes Saved (Paid) n(4)
7,838 7,838 7,838 7,838 9. Net Available Cash n(5)
7,647 8,078 8,531 9,010 10. Investment Results of Avail.
Cash n(6)
11. Additional Deduction n(7)
$ 2,294 $ 2,423 $ 2,559 $ 2,703 12. Taxes Saved (Paid) n(8)
1,262 1,333 1,408 1,487 13. Cash Flow
978 1,360 1,764 2,191 14. Additional Cash Available n(9)
2,240 2,693 3,172 3,678 15. Cum. R.E. Ltd. Ptnrshp. at 5%
$29,136 $38,671 $49,135 $60,602 [n(1)] Straight Line for 96 months [n(2)] Includes 1st year bonus of $2,000 [n(3)] 1978: 6 months based on June purchase [n(4)] 55% tax bracket plus $10,000 I.T.C. 1st year [n(5)] Line 8 less line 4 plus line 14 from previous year [n(6)] Invested in Real Estate Ltd. Partnership with 30% 1st year write-off and 5% sheltered cash flow and a 5% growth factor [n(7)] 30% of line 9 [n(8)] 55% of line 11 [n(9)] Line 12 plus line 13
*354 APPENDIX D The following 27 tapes were aired on Green Country Cable (Sapulpa, Oklahoma), Channels 18 and 29 on December 29, 1979: CHANNEL 18
Forehand Drive Backhand Drive Trick Shots The Serve in Tennis Instant Tennis Golf Course Equipment Singles Tactics Mixed Doubles Tactics Games Golfers, Hustlers and Cheaters Play Doubles Tactics Tennis Specialty Strokes Tools of the Trade Questions and Answers CHANNEL 29
The Beginning Golf Swing, Grip and Stance Beginning Chipping Faces on the Go Beginning Putting After the Driving Range . . . then what? Hair and Make-Up Intermediate Putting How Golf Clubs are made Three Faces of Beauty What's a Hazard . . . the Sandtrap Water, Trees and Tall Grass . . . or where did the Ball Go? Fabulous 40's Advanced Chipping and Putting Advanced Golf Swing Footnotes
1. The consolidated cases are set forth in Appendix A hereto, listing petitioners by name, the years involved, the deficiencies and additions to tax for each year, and the place of residence of each petitioner at the time his petition was filed. The deductions, losses and credits claimed by petitioners with respect to their purchases of the videotapes are set forth in Appendix B.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. At the time, Johnson had no experience in the production of a commercial videotape series; his experience was limited to the taping of corporate motivational seminars and training programs.↩
4. Of the tapes in this series, only the following are in issue herein: The Beginning Golf Swing Beginning Putting Advanced Golf Swing ↩
5. Of the tapes in this series, only the following six are in issue herein (all of which were completed in 1979): Tools of the Trade Questions and Answers Face on the Go Fabulous 40's Three Faces of Beauty Hair and Make-up↩
6. Each note provided as follows: 1. SCHEDULE * * * d. In addition to the payments made in Paragraph 1 (b), during the first three (3) years of the term hereof, from the Maker's net receipts, if any, the Owner shall make a required payment of an installment equal to: (i) any accrued but unpaid interest; and (ii) to the extent of forty-five percent (45%) of the then remaining Maker's net receipts, as a principal payment. The remaining fifty-five percent (55%) of such receipts may be retained by the Maker. Said payments shall be due and payable at the quarterly [sic] on March 31, June 30, September 30, and December 31 of each year and shall be delinquent if not paid on or before sixty (60) days following the end of each said calendar quarter. e. In addition to the payments made in Paragraph 1 (b), during the last four (4) years of the term hereof, from the Maker's net receipts, if any, the Maker shall make a required payment of an installment equal to: (i) any accrued but unpaid interest, and (ii) a principal payment in the amount of the depreciation or reduction in value claimed or to be claimed by the Maker for such taxable year, plus forty-five percent (45%) of any remaining Maker's net receipts. Payment shall be due and payable quarterly, as above in Paragraph 1 (d), and shall be delinquent if not paid on or before sixty (60) days following the end of each calendar quarter. ↩
7. The note contained the following pertinent to the conversion to nonrecourse: Provided that all payments hereunder by Maker to Payee are then current, the Maker may extend the term hereof for an additional seven (7) years and convert this Agreement [sic] from full-recourse to non-recourse upon the following conditions: (1) By paying to Payee the additional sum of One Thousand Dollars ($1,000) per tape to be applied to principal, and (2) Provided that Maker has complied with the terms of the Agreement [the Production Service Agreement, the terms and conditions of which were incorporated into the Note] and Note and has otherwise made reasonable efforts to exploit the Tapes for approximately seven (7) years, and the occurrence of any of the following events: (i) the achievement of gross earnings so that the Maker's net receipts as applied herein will have paid all interest plus a minimum of one-third (1/3) of the principal balance hereof; or (ii) the licensing of a film and/or television distributor having had gross receipts in excess of $2,000,000 per year from the distribution of films and television tapes for each of the last two (2) years prior to said licensing to distribute the Tapes at its own expense on terms and for fees, however contingent, which are in accordance with accepted standards of the television industry; or (iii) the achievement of sales in the videorecorder or videotape player industry of units by which a video cassette or disk can be played in private or family residences totalling 2,000,000 units in the aggregate. Amount claimed -- amount utilized in year may differ ** Denotes a carryforward or carryback of item from another year
*
(3) The Owner agrees to continue reasonable efforts to exploit the Tapes for the purpose of making payments on the unpaid balance hereof and for Owner's profit. * No method was prescribed for the determination of this event, i.e., the number of videotape players sold. Petitioners contend that the 2 million benchmark was intended to be annual sales, rather than aggregate sales and that the 2 million figure was intended to be limited to United States sales rather than world-wide sales. Respondent disagrees with this contention; we agree with respondent. By 1978, world-wide sales of VCRs and video disc machines exceeded 2 million units. Thus, we believe that when the notes were executed, both petitioners and Pro Video recognized that the third event would be a virtual certainty at the time the note could be extended.↩
8. These items are set out in the following: 6. The Owner's Representations, Warranties and Covenants * * * e. Within thirty (30) days after delivery of the Tapes to the Owner, the Owner shall enter into a distribution agreement and shall commence to perform and diligently continue to perform all acts necessary for the commercial exploitation of the Tapes. * * * h. Owner, utilizing Owner's own initiative and effort and not relying on any information or suggestions or acts by Producer's agent or employees, will seek to engage an independent management consulting service to advise and counsel Owner as to the method by which Tapes should be best distributed for Owner's benefit. i. Owner warrants and represents that, subsequent to entering into this Agreement, Owner shall contact a management consulting firm within fourteen (14) days to help Owner in the selection of a distributor for the purpose of exhibiting the Tapes in all media.↩
9. The brochure presented different projections for purchases made in June, September and December. Appendix B sets forth only the June projections, which are representative of the manner and substance of the projections available to the purchaser.↩
10. Diversified was a general partnership formed in 1979 by Ball in order to permit his clients to jointly invest in a multitude of ventures. The following is a list of petitioner-partners in Diversified, his capital contribution and percentage of ownership interest in the partnership: ↩
Partnership
Capital
Percentage
Petitioner
Contribution
Interest
Jack E. Bucknum
$8,000.00
8%
Albert Davis
5,000.00
5%
Alvin Janklow
15,000.00
15%
Dale Kennen
5,000.00
5%
Marvin Waldman
7,000.00
7%
11. Pro Video carried liability and property damage insurance during the relevant periods in the amount of $500,000. We note that the aggregate $500,000 insurance coverage falls significantly short of the tapes' aggregate alleged value.↩
12. The background information will be with respect to the male petitioners only.↩
13. Respondent advanced numerous alternative arguments, none of which we need to consider since we agree with respondent's primary position.↩
14. We recognize that in Rose v. Commissioner,88 T.C. 386 (1987), a case involving a "generic tax shelter," we adopted an objective test of economic substance rather than a subjective test of profit motive. This case was tried and briefed by the parties prior to Rose, in terms of the presence, or absence, of a profit objective under the factors set forth in section 1.183-2(b), Income Tax Regs.↩ We shall therefore base our analysis on those factors.
15. We also note that in Rose v. Commissioner,supra, we set out the following characteristics as indicative of the lack of profit motive/economic substance in cases involving generic tax shelters: (1) the tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promisory notes, nonrecourse in form or in substance. As stated in Rose, in cases having these characteristics, tax motivation is apparent. 88 T.C. at 412↩. The question then to be addressed is whether a sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits.
16. Ball's only experience in the field was with the unsuccessful videotape venture offered by Del Vida, which Ball marketed to some of the petitioners herein. That venture, involving tapes similar in content and quality to those offered by Pro Video through Ball, earned no money for its participants.↩
17. Some petitioners viewed a demonstration tape prior to the investment.↩
18. As noted supra,↩ the only income earned by the Pro Video tapes during the years in issue stemmed from their singular showing in Sepulpa, Oklahoma in 1979, with petitioners netting no income.
19. We recognize that during the period in question, the production and marketing of videotapes was a relatively new field and that it could be difficult to find persons with a great deal of expertise in the area. However, by the same token, since the field was relatively new, we would have expected petitioners to exhibit more caution when making such substantial investments had they held bona fide profit motives.↩
20. At the time of trial, Mr. Reel was an attorney specializing in the entertainment field. Prior to that, he had held several executive positions with major network and syndication video program producers and had written two books for publication, one specifically dealing with the development of the television industry and its economics of production and distribution. ↩
21. In arriving at this value, Mr. Reel estimated that distribution fees and costs would be approximately fifty percent of the anticipated gross receipts per tape.↩
22. The requirement that at least one of three specified events had to occur before the notes could be converted to nonrecourse is meaningless since it was a virtual certainty that one of those events would occur. See note 6, supra.↩
23. Prior to 1981, section 6653(a) read substantially as follows, with certain minor amendments during the years in issue: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- If any part of any underpayment (as defined in subjection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B (relating to income taxes and gift taxes), or by chapter 45 (relating to windfall profit tax) is due to neligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a) was amended by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, to read as follows, applicable to taxes the last date of payment of which is after December 31, 1981: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).↩
24. See note 26, infra.↩
25. Section 6659 provides, in relevant part: SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX. (a) ADDITION TO THE TAX. -- If -- (1) an individual, or (2) a closely held corporation or a personal service corporation, has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. (b) APPLICABLE PERCENTAGE DEFINED. -- For purposes of subsection (a), the applicable percentage shall be determined under the following table: If the valuation claimed is the following
The applicable
percent of the correct valuation --
percentage is:
150 percent or more but not more than 200 percent
10
More than 200 percent but not more than 250 percent
20
More than 250 percent
30
(c) VALUATION OVERSTATEMENT DEFINED. -- (1) IN GENERAL. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). (2) PROPERTY MUST HAVE BEEN ACQUIRED WITHIN LAST 5 YEARS. -- This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.↩
26. With respect to the Singles Tactics tape, the overvaluation amounted to over 3000 percent of the true value. For the Face on the Go tape, the overvaluation was over 2500 percent. ↩
27. Moberg argues that respondent's failure to assert these additions to tax under section 6653(a)(2) and section 6659 against all petitioners constitutes a waiver of those issues as to all petitioners. The failure to assert additional taxes as to certain taxpayers for some years does not operate to waive such additions with respect to other taxpayers. See Kehaya v. United States,355 F.2d 639, 641 (Ct. Cl. 1966). Therefore, this argument is without merit. Moberg also contends that section 6659 as applied to his 1981 taxable year constitutes a retroactive application in violation of his right to due process. Section 6659 was enacted by Congress pursuant to Pub. L. 97-34, section 722(a)(1), 95 Stat. 172, 342, (1981), applicable to returns filed after December 31, 1981. The valuation overstatement for 1981 was reported on Moberg's 1981 return. As the return was filed after December 31, 1981, the application of section 6659↩ is proper and is not a deprivation of their right to due process.